MUNN & COMPANY (a corporation),

*v.*

THE AMERICANA COMPANY et al.

[Decided August 9th, 1913.]

1. Where a corporation which succeeded a partnership of the same name claimed the right to use the name "Scientific American," which had been previously owned by the partnership, parol evidence that the transfer of the partnership assets to the corporation included the right to the use of such name was sufficient to sustain a finding that the corporation owned the name, in the absence of any objection thereto or insistence by defendants that the transfers should be produced.

2. Where complainants, engaged in the issuance of a periodical known as "Scientific American," authorized defendants, by written contracts for a consideration, to use the name "Scientific American Compiling Department" in the compiling and sale of a scientific encyclopedia called the "Americana," before such contracts were finally determined in June, 1911, defendants were not entitled to use such name in editions of the work put out after that time, except to show that the original work had been compiled in connection with complainants' bureau.

3. Where defendants' right to use the words "Scientific American" in connection with the sale of subsequent editions of a scientific encyclopedia terminated in June, 1911, and complainants showed instances of loss of advertising or subscriptions as a result of dissatisfaction with the encyclopedia, and also that defendants' further use of the name was calculated to injure complainants' property, and would probably expose complainants to risk or liability, injunction was the proper remedy.

4. Where defendants, in compiling a scientific encyclopedia, procured the right from complainants, which published the "Scientific American," to put out the encyclopedia under the name "Scientific American Compiling Department," defendants' right to use the name depended solely on contract, so that on the termination thereof defendants were not entitled to longer use the name in· connection with subsequent editions of the work, both on the principle of estoppel, and on the theory that to longer use the same would tend to mislead the public.

5. A corporation, in assuming a name in which to carry on its business of publication, has no right to adopt a name which, *prima facie* without explanation, will fairly indicate to a person dealing with it, of average and ordinary intelligence, that the work is the publication of another, since the restriction on the selection and use of corporate names or methods of business, tending to deceive the public, are independent of statutory restriction, and additional thereto, and may be enforced on behalf of persons to whom the use of the name would occasion injury.

6. Where a contract authorizing defendants to use the words "Scientific American" in connection with the sale of a scientific encyclopedia finally terminated in June, 1911, the fact that complainants delayed filing a bill to enjoin defendants' continued use of the name until December, 1911, which delay was due largely to time required to procure evidence, was insufficient to charge complainants with laches.

7. An injunction restraining the further use of the name "Scientific American" in the corporate name of a corporation, putting out a scientific encyclopedia, which, under contract with complainants, had previously been published as coming from complainants' compiling department under the name "Scientific American Compiling Department," would not be denied on the ground of hardship, where the hardship or injury to such corporation from the discontinuance of the name, if any, would be brought about by its acts in increasing its stock and taking over the assets and contracts of another corporation, which had previously published the encyclopedia, after the contracts authorizing the use of the name had expired.

Heard on bill, answers, replication and proofs.

Munn & Company, a New Jersey corporation, are the owners and publishers of the "Scientific American," a weekly publication, commenced under that name in the year 1845 by Munn & Company, a partnership, and continued until the present time. The New Jersey corporation have published the "Scientific American" since 1900, when they took over the property and business of a New York corporation of the same name, which had been there incorporated in 1896, and which had then taken over the publication and the business of the partnership called Munn & Company, who founded the enterprise in 1845. The complainant corporation also issue at the present time other publications besides the "Scientific American," these being "The Scientific American Supplement," a periodical similar in general character, and "American Homes and Gardens," formerly the "Scientific American Building Monthly," and have also published books, these being "The Scientific American Encyclopedia of Receipts" and "The Scientific American Encyclopedia of Formulas." By its charter it is authorized generally to manufacture, publish and sell newspapers and other publications. The general character and scope of the "Scientific American" is the treatment of scientific and industrial subjects, mechanical news, inventions, chemistry, astronomy, engineering news, &c. It is probably the oldest of the American publications of this character and has a circulation of at least fifty thousand all over the United States, Canada and British possessions, besides a large foreign circulation. The bill is filed against three corporate defendants, the Americana Company, a Maine corporation, the Americana Company, a New York corporation, and "The Scientific American Compiling Department," a New Jersey corporation, and one individual defendant, Robert S. Peale, an officer of the corporation, alleged to be the promoter of them all.

The defendant companies are all publishing companies which were formed at different times in connection with the publication of an encyclopedia called the "Encyclopedia Americana," or, later, "The Americana," the publication of which was originally

projected by the defendant, Peale, under the name of "The International Society," of which he was the president.

For several years the use of the name "Scientific American" in some connection with the placing of the encyclopedia upon the market was under contracts made by the complainant with the American Company of New York, or its predecessor, the International Society. This continued from November, 1902, until June, 1911, when the last contract was formally terminated and complainants refused to receive payments under it. At that time, and at the time of filing the bill (December 28th, 1911), the edition of the encyclopedia being placed on the market bore on the title page as publisher the name "Scientific American Compiling Department." The title itself of the book was then "The Americana." Complainants had at and before the formal termination of the contract demanded the discontinuance of the use of the name "Scientific American" in connection with the publication, and this not being complied with, filed the bill. The main object of the bill is to enjoin the use in any manner of the name "Scientific American" by any of the defendants in connection with the corporate title or with any of their publications. The complainants put their right to relief upon the grounds:

*First.* That the right to use the name "Scientific American" was never granted to the corporate defendant "Scientific American Compiling Department."

*Second.* That the name is a trade name of complainants, to which they have a property right, and which cannot be used by any of the defendants without consent, after the termination of the contract.

*Third.* That the use of the name has subjected and will continue to subject complainants to loss, injury and damage, and is a fraud on complainants and on the public, entitling them to injunction and equitable relief.

As to the right to the use of the name in the corporate title, and for all corporate purposes, defendants claim—*first,* an absolute legal right to its selection and to its continuance, without reference to any right under the contracts; and as to the use of the name in connection with the publication and placing of the

encyclopedia upon the market, they further claim—*second,* that the situation and circumstances connected with the use of the name for this purpose by virtue of the contracts and the course of business with complainants thereunder has been such as to entitle them to continue this use of the name in connection with the "Americana," notwithstanding the termination of the contract; *third,* that complainants having failed to show any loss or damage by reason of this use of the name in connection with the defendants' publication, is not entitled to equitable relief by injunction. As further defences they set up estoppel and laches as bars to equitable relief, in case it should be held that the use of the name "Scientific American" by either of them is without legal right.

The case, in my judgment, turns largely upon the question of the effect of the contracts and the course of dealing under them, in reference to the publication of the "Americana," either as qualifying any right complainants may originally have had to the exclusive use of the name or words "Scientific American," in connection with any publication, or as qualifying the relief they may be entitled to on this bill. And a statement in some detail will, therefore, be necessary in reference to the contracts and course of dealing, and also in reference to the acts and conduct bearing on the defences of estoppel and laches.

(Here follows a statement of the evidence in detail.)

*Messrs. Fort & Fort* and *Mr. Masten* and *Mr. Hamilton* (of the New York bar), for the complainants.

*Messrs. McCarter & English* and *Mr. Thomas P. McKenna,* for the defendants.

EMERY, V. C. (after statement).

A preliminary objection was raised at the hearing, that complainants had failed to prove any right or title to the use of the name "Scientific American" as a trade name or trade mark for their publications or otherwise, because of the failure to prove a conveyance of the same from Munn & Company, the original partnership who adopted it in 1845, or from Munn &

Company, the New York corporation who succeeded to the rights of Munn & Company in 1896. The use of the name by complainants as successors in business to Munn & Company, since their incorporation in 1900, is sufficient, even without proof of a formal written conveyance of the right to use the name, certainly as against those using the title or name without any authority. But, secondly, there was proof, by the evidence of Mr. Charles A. Munn, on cross-examination, that the transfers were made by written documents. He was requested to produce them and promised to do so, if he could find them, but as nothing further took place at the hearing in reference to their production, and his parol evidence as to the contents of the papers was allowed to stand, complainants' right to the name stands proved on the parol evidence brought out by defendants and not objected to, so that there is no technical basis for the objection of complainants' failure to prove title.

*First.* As to the defendants' right to the use of the name "Scientific American" since the termination of the contract for its use.

The substantial facts which I find to be established by the evidence above stated in relation to the use of the name "Scientific American" by any of the defendants at the time of filing the bill and subsequently are as follows: By the original contracts of 1902 and 1904, one of defendants, the Americana company (of New York) was expressly authorized by the complainants to use exclusively the name "Scientific American Compiling Department" for the purpose of selling the "Encyclopedia Americana" in connection with subscriptions to the complainants' periodical, the "Scientific American;" at the time of making the contracts of 1904 giving the exclusive use of the name, the "Scientific American Compiling Department" had been previously used, not as the publisher of the work, but merely as a selling name used by the Americana company, under whose name as publisher the work was published originally and at the time of making the contract of 1904; during the continuance of this contract (which by its terms extended to March 1st, 1906), the complainants without any express obligation under the contract to do so, did in fact co-operate in the prep-

aration of the encyclopedia by giving the publishers the use of their illustrations and of their collections and compilations of information organized and developed in connection with the publication of their paper, "The Scientific American," from the date of its original publication in 1845, and appropriately called a "Compiling Department," and also advertised this kind of connection and assistance in the "Scientific American" newspaper; shortly after the making of the contract of 1904 with the Americana Company of New York, the defendant, the "Scientific American Compiling Department," was incorporated in New Jersey by Mr. Peale (who controlled also the Americana company of New York) with a small capital stock—$2,000— but with broad powers of publishing as well as selling; during the continuance of the contract of 1904 and its extensions, the only power used by the Scientific American Compiling Department was that of a selling agent, in whose name the contracts of subscription were taken, and the contracts so made in this name, both before and after the incorporation, were delivered over without assignment to the Americana company (of New York), the publisher of the work; about or shortly after the expiration of the contract of 1904, and before the agreement for its extension, the complainants through their director and officer, Mr. Beach, who was not at that time interested in any of the defendant corporations, knew of the fact of the incorporation of the Scientific American Compiling Department, but had no knowledge or information that it was incorporated for any other purpose than in connection with the publication of the "Americana" under the contract, and. as an instrument for carrying it out; that none of the other officers of complainants had at that time any knowledge of such incorporation, and that at the time of the extension of the contracts in May, 1906, neither Mr. Beach nor any officer of the complainants had any notice of any right or claim of any of the corporate defendants to the use of the name "Scientific American" in their corporate title or otherwise, except in connection with the carrying out of the contract; that in this posture of affairs and when the new "Americana" was complete, the defendant, the Americana Company (of New York), and Munn & Company, the complainants

(through all their officers), agreed upon the terms of a circular letter which should give information to the public as to the connection of the publishers of the "Scientific American" with the new "Americana." This circular letter, issued in May, 1906, addressed to the American people and signed by Munn & Company, described the work as published by the "Scientific American Compiling Department" (not the Americana Company) with their (Munn & Company's) full co-operation, "under the direct editorship and personal supervision of Mr. Frederick Converse Beach, editor of the Scientific American," and assured the public that it would be found standard in its information and fully equal to the reputation of the "Scientific American" for accuracy and reliability. In connection with this circular letter, the contract of 1904, expiring by its terms on March 1st, 1906, was extended to March 1st, 1907, with provisions for future extensions. After this circular letter and the subsequent extensions of the contract, and up to the termination thereof in 1911, the title pages of the "Americana," copyrighted by and in the name of Mr. Beach, bore the name "Scientific American Compiling Department" as publisher. The real publisher and owner was, however, the Americana Company (of New York) until December, 1906, and from that time the Americana Company (of Maine), which succeeded to the rights of the Maine company and owned the plates and contracts. During the same interval (1906 to 1911) the volumes on the title page were also advertised as "issued under the editorial supervision of the Scientific American," and copies of the circular letter were by the publishers placed in the hands of the agents of the Americana for use in reply to inquiries as to the connection of complainants with the "Americana." During all this time the complainants received the benefits of the payments under the contract which were, or were intended to be, enhanced and increased by the use of this circular letter, assuring to the public and especially to subscribers for this work of reference the benefit of complainants' long and thoroughly established reputation for reliability and accuracy. Pending the running of the contract and partly by reason of the impression of complainants' connection with the work given by agents so-

liciting subscriptions, confusion occurred which required attention by complainants to claims involving financial responsibility for the contracts and representations of the agents securing them, as well as responsibility from a literary or editorial standpoint. As a rule, these communications, which increased during the latter part of the connection, were referred to Mr. Beach during the running of the contracts. These claims, based both on financial and literary responsibility, were so frequent—every two weeks on an average—and of such a character as to impose upon complainants the burden of repelling or answering them in order to avoid claims of responsibility. This was of itself, in my judgment, an injury or damage to complainants in their business as publishers of the "Scientific American," which could not be imposed on them without their consent and from which on the termination of the contract, they were entitled to be relieved, except so far as it was the necessary result of the contract and their dealings under it. For six months previous to June, 1911. the date of actual termination of the contract, the complainants and the defendants, the Americana Company of Maine and the Scientific American Compiling Department, contemplated and prepared for the termination of the contract, the defendants requesting delay as necessary for the elimination of the "Scientific American" from the enterprise. As a part of this elimination complainants insisted on the abandonment of the use of the words or name "Scientific American" in the corporate name, or otherwise, but defendants insisted on the right to the continuous use of this corporate name as publishers of the "Americana," and since the termination of the contracts have continued this use of the corporate name, as well as in the contracts of subscription, but no other reference to the "Scientific American" appears on the title page than the designation of the Scientific American Compiling Department mentioned as publishers. In the "canvasses" or instructions to agents soliciting subscriptions for the editions previous to that of 1911, the publishers instructed them to state that they came from the "Scientific American. People," the leading scientific paper of the world, which for forty years had maintained an information bureau for its subscribers free of expense on any subject,

and that the "Scientific American" had built up a national system of reference used in making the "Americana." In the canvass for the editions of 1911 the agents are instructed to state that they are from "The Scientific American Compiling Department;" the reference to the "Scientific American" paper is omitted, but there is in the canvass a reference to an "Information Bureau" originated by it, "The Scientific American Compiling Department," as the foundation of the work. This bureau in its character is substantially the same as that of the "Scientific American" referred to in the earlier canvass. The canvass of 1912 (used since the beginning of the suit) is of the same character. Since the termination of the contracts the agents, while being instructed to continue the use of the name "Scientific American Compiling Department," have also been instructed both verbally and by letters to discontinue mentioning Munn & Company and "The Scientific American" as connected with the edition, but they do not appear to have been instructed to disavow such present connection, if no inquiries relating to it are made, either by new subscribers, or by old subscribers, who are applied to by agents to take the new and present edition with the allowance of an abatement from the regular subscription price on the return of the old edition for exchange. Notwithstanding the instructions which have been given, and as the result of the use of the corporate name "Scientific American Compiling Department" in obtaining the contracts of subscription and the representations of agents in procuring the same or in connection therewith, many instances have occurred, since the termination of the contract and up to the time of the hearing, of confusion in the minds of subscribers or proposed subscribers as to the complainants being still connected with or co-operating in the present publication of the work, and applications to the complainants arising from this confusion require attention from them in order to repel or avoid responsibility therefor, either financial or literary. Some instances of loss of advertising or subscriptions as the result of dissatisfaction with the "Americana" or the agents have also been shown. If what is being done by defendants is calculated to injure the property of complainants and the probable effect of it will be to expose

them to risk or liability, then an injunction is the proper remedy. *Walter* v. *Ashton (1902), L. R. 2 Ch. Div. 282,* approved in *Vanderbilt* v. *Mitchell (Errors and Appeals, 1907), 72 N. J. Eq. (2 Buch.) 910; Edison* v. *Edison Polyform Manufacturing Co. (Vice-Chancellor Stevens, 1907), 73 N. J. Eq. (3 Buch.) 136.*

This confusion requiring attention and action on the part of the complainants to avoid responsibility, has already, in my judgment, caused an injury and damage to the complainants in carrying on their business as publishers of the "Scientific American" newspaper, and is a confusion against the further continuance of which, in the present and future publications of the "Americana" they are entitled to equitable relief as the only effective relief. The confusion results primarily and directly from the use of the complainants' well-known and long established name, "Scientific American," in connection with the name of publishers and sellers of a book of reference like the "Americana," including in its volumes scientific and other information, the collection and compilation of which the "Scientific American" has made a specialty for sixty years. The addition of the words "Compiling Department," so far from distinguishing or disassociating the publisher and seller of the work from those of the "Scientific American" *prima facie* indicates a special and appropriate character of the association of the publishers of the paper with the publisher of the "Encyclopedia." The latter is published by the "Scientific American Compiling Department," the natural and ordinary method of describing a department of the "Scientific American," and of describing such a department as would be specially concerned with the compilation of information on scientific and other kindred subjects included in an encyclopedia. Both parties to the suit have from the time of their first contracts concurred in this view of the effect of this name "Scientific American Compiling Department" in connection with the encyclopedia, as giving it the benefit of this special information bureau or "Compiling Department" of the "Scientific American" newspaper, developed in their half century or more of its publication. In the stationery and literature of the "Scientific American Com-

piling Department" used during their co-operation prior to 1911, a "comma" followed the words "Scientific American," thus making the direct formal representation that the· "compiling department" referred to in the name "Scientific American, Compiling Department" was a department of the paper.

It must also be considered that the defendant, Americana Company, procured the original use of the name "Scientific American Compiling Department" for the purposes of the contract and solely on the faith of the contract and upon very substantial money consideration given therefor, and under the contract and the dealings and course of business of the parties has received the benefit of the name and of the reputation of the "Scientific American" as an accurate and reliable compiler of information on a great number of topics, treated in such a book of reference as the "Americana." On the termination of the contract they cannot, as it seems to me, equitably have the right to appropriate permanently and without compensation, as long as the corporation continues to exist and publish a work of reference, the benefit of the name "Scientific American" for that purpose. The continued use of the name after the expiration of the contract and the continued appropriation of benefits which had their origin solely in contract, comes, in my judgment, within the operation of the principle of estoppel, and upon this ground, as well as upon that of confusion actually arising from the use of the name in the corporate title, complainants are entitled to relief. These two grounds relate to the right to the use of the name, considered solely with reference to its effect as between the parties themselves by reason of their contracts and dealings and the loss or injury resulting to complainant by reason of confusion. And there is another consideration involved in cases of this character, viz., that of the public to whom the name "Scientific American Compiling Department" is held out as the publisher and seller of the "Americana." No corporation has the right in assuming a name in which to carry on its business of publication, to adopt a name which *prima facie* and without explanation would fairly and reasonably indicate to a person dealing with it, of average and ordinary intelligence, that the work was the publication of another. The restrictions upon

the selection and use of corporate names, or methods of business, tending to deceive the public, are independent of statutory restrictions and additional thereto, and may be enforced on behalf of persons (in this case other publishers) to whom the use of the name would occasion an injury. *L. Martin Co.* v. *L. Martin and Wilckes Co.* (*Vice-Chancellor Stevenson, 1908*), *75 N. J. Eq.* (*5 Buch.*) *39.* In the absence of specific explanation from the agents that the "Scientific American" no longer had any connection with, or co-operated in the publication, I think it would naturally and reasonably be taken for granted by anyone dealing with the agents, that the publisher of the present edition of the "Americana" was a department of the Scientific American newspaper, called the "Scientific American Compiling Department." The public to whom the work is offered for subscription, are entitled to know that with the publication and placing on the market of the present editions of the "Americana" the publishers of the "Scientific American" have no connection or responsibility of any kind, financial or literary. To compel, or attempt to compel, specific explanation by soliciting agents, that the publishers of the "Scientific American" are not connected with the present publication of the work, or with the company itself is, in my judgment, a futile and impracticable method, and the only certain or practicable method of insuring to complainants proper protection is that of enjoining altogether the further use of the name "Scientific American" in the corporate title, and also enjoining its use in the publication or vending of the "Americana" of the editions of 1912 and any future editions except as hereafter stated.

Reaching this conclusion upon the question of the continued use of the name, merely as one of right in the respective parties, upon the termination of the contract, there remain to be next considered the further questions of the extent and scope of the relief as to the use of the name in the publication and the bar of complainants' relief by reason of estoppel, laches or hardship.

*Second.* The extent and scope of the relief to which complainant is entitled in reference to the use of the name "Scientific American" in connection with the publication and vending of the "Americana."

The complainants, as publishers of the "Scientific American," in fact co-operated with the defendants in the preparation and publication of the "Americana;" up to and including the editions of 1910, and in the issues up to June, 1911. Their bill for injunction against the use of the name was not filed until December, 1911, and until after some portions of the editions of 1911 had been put on the market. The entire editions from 1903 to 1910, and the edition of 1911, so far as the same had been placed on the market up to the termination of the contract, must, for the purposes of any injunction, be considered as published or allowed to be published under the contracts. The injunction prayed by the bill extends to the restraint of any representations that the "Americana" *was* prepared under the auspices of or any connection with complainants. Such representations, if made with reference to the editions up to 1910, would be true, and complainants are not entitled to any injunction against such representations. The co-operation during the contracts was moreover one for which the publishers of the "Americana" paid the large consideration provided by the contract, and they are entitled to the full benefit of this, and also, if they desire, to continue to state, according to the truth and the facts, the connection of the "Scientific American" with the editions of the "Americana" up that of 1912, and the injunction should not restrain any statements of the truth as to their past relations. And not only is this right to the truth and facts about the complainants' connection with the previous editions one to which the defendants are entitled on the basis of fair dealing under the contracts, but it is also a right and benefit, no doubt of considerable value to the subscribers to the "Americana" procured while the co-operation in its publication existed, and was publicly announced by complainants' circular letter and otherwise for the purpose of procuring these subscriptions. Complainants have no equitable standing whatever, in my judgment, to restrain or enjoin any truthful representations of defendants in relation to the complainants' past connection with the work, which do not give a false impression as to any present connection. The basis for the representations which defendants are entitled to make as to these past editions must, as it now seems to me, be

the circular letter of 1906, which was after due consideration agreed upon by the parties as a careful and correct statement, and was for this' purpose given to the public, but these representations as to past connection should, however, be only made in such manner as to show that it no longer exists, and before making any change from the temporary restraining order, it will be necessary to settle with some care in any decree for injunction against the future use of the name in publishing or marketing the work, the form of exceptions as to statements relating to the past connection of complainants.

*Third.* As to the equitable relief by injunction being barred on the grounds of estoppel, laches or hardship.

The defence of estoppel is based on the equities claimed to have arisen by reason of the license to use the name "Scientific American Compiling Department" in connection with the publication of the "Americana" under the circumstances above detailed, and the defendants' purchase of this right and expenditure of large sums of money in connection with the right or license and on the faith of it. These give it, as is claimed, a perpetual license, and complainants after receiving the consideration and permitting the expenditure, are estopped from setting up a right to enjoin the continuance of the use of the name in connection with the present or future publication. Defendants are entitled, in my judgment, to the benefit of all estoppels arising from the license to use the name, given by the contract itself, or arising necessarily out of this use under the contract, and this will include the right to retain the proper connection of the name as to all editions published during the co-operation under the contracts, but cannot be extended beyond the contract, and to give defendants the perpetual right to the use of the name. So far as the defendants are entitled to the benefit of any estoppel arising out of the publication of the editions previous to 1912, they can be protected by the decree.

The claim of laches is not well founded. The disuse of the name "Scientific American" was formally demanded in June, 1911, and the filing of the bill (in December, 1911) was not such a delay as to deprive complainants of the right ever to apply for protection against its future use. The delay was considered

important in reference to a preliminary injunction, but, on the question of right, delay such as occurred in this case, due largely to the time required to procure evidence, is not of a character to disentitle complainants to all future protection against the use of their name and reputation.

The objection of hardship was strongly urged against enjoining the further use of the words "Scientific American" in the corporate name, and the complications which may possibly arise by reason of the disuse of the name, in order to preserve the full benefit of all defendants' existing property rights connected with the use of the name, should certainly be matter for careful consideration, in fixing the time, terms and conditions upon which the decree for injunction shall go into effect. These may, if necessary, be made the subject of special reference or inquiry, but the difficulty of adjusting proper relief is not a basis for denying altogether the relief by injunction to which complainants are entitled. And all these difficulties and hardships now claimed to affect the absolute right of relief have arisen and been intentionally brought about by the defendants, since the termination of the contracts, or in anticipation thereof. Up to April 1st, 1911, the capital of the "Scientific American Compiling Department" was only $2,000; it was only the selling agent for the "Americana Company," and the outstanding contracts of subscription (fifty thousand or more), although taken in its name, had been delivered over without assignment to the Americana Company, which owned or controlled it, and on or about the date mentioned all of these outstanding contracts were assigned over by the Americana Company to Mr. Peale in consideration of his assuming its obligations. All of the contracts since that time taken by and in the name of the "Scientific American Compiling Department," as the selling agent of the "Americana Company," still belong to the latter company. Suits on any of these contracts whenever necessary heretofore seem to have been brought in the name of special assignees to whom they were assigned for the purpose, and if any provision or exception be necessary as to the use of the name for the purpose of retaining the benefit of any of these contracts, it can be

secured by the decree itself which provides against the future use of the name.

The hardship or injury to the present stockholders of the "Scientific American Compiling Department," from the discontinuance of the name, if it be considered as reasonably to be expected, is also one that has been brought about after the termination of the contract, by the deliberate action of those who controlled the issue of the stock at that time. The stock was increased from $2,000 to $2,000,000 for the purpose of exchanging it for "Americana Company" stock, and this latter stock is all now owned by the "Scientific American Compiling Department." Complainants had no notice or knowledge of these proceedings, for the knowledge and participation of Mr. Beach, who had, in April, 1911, become adversely interested, was no knowledge or notice to complainants.

The increase of stock cannot, as it seems to me, confer on the stockholders any individual or personal right as such to the perpetual continuance of a company name in derogation of complainants' rights to the name. The question is altogether one of corporate right, and the only bearing which the personal holdings of stock has upon the question now at issue is whether the facts proved show that by reason either of their acts or neglect, the complainants can be held to have had such notice of the general issue of this increased stock and its circumstances, as now to disentitle them to complain of it, because of their own neglect. No such notice or responsibility on the part of complainants or any connection therewith appears except on the part of their Mr. Beach, who was adversely interested and participated in the increase of the stock, and there is no equitable ground, in my judgment, for denying relief in regard to the further use of the corporate name to which they may be entitled, on the ground of any supposed hardship to the stockholders who, without knowledge of any controversy as to the use of the name, have purchased or acquired its stock by exchange since the termination of the contract. The terms of the decree can protect against the disturbance of any existing property rights, and apparently to stockholders the only loss or hardship is that resulting from the *prima facie* connection of the "Scientific

American" with the company by reason of the corporate name. As there is no such connection, and has not been since the purchase or exchange of the stock, this hardship, if it exists, even as to those who purchased the increased stock, is one as to which they must be considered as having taken the risk, and they are not entitled to make any loss or hardship to them as individual stockholders a ground for continuing the use of the name. The stockholders who exchanged Americana Company stock are in a still less favorable position to set up this defence, for so far as they are individually interested, the exchange made after the termination of the contract is apparently for the purpose of giving to them as stockholders of the Americana Company the continued benefit of the use of the name "Scientific American" after the right to such benefit had expired under the contract with the "Americana Company." And Mr. Peale, Mr. Huntley and Mr. Beach, the stockholders who actually brought about the increase and exchanges, manifestly have no standing personally as such stockholders to set up any loss or hardship resulting from these proceedings as a bar to complainants' relief.

A decree for injunction will be advised upon the basis of this opinion, and as to the terms and conditions, if any, upon which it should be issued and the time when it should issue and take effect, I will hear counsel at the time of settling decree. In the meantime, or until further order, the temporary injunction as issued is to remain in full force and effect. Defendants may apply for a settlement of decree or for modification of the temporary injunction on the basis of above opinion at the time of settling decree. I will hear counsel of complainants, if they desire upon the matter of complainants' right to a decree for an account of profits which is also prayed by the bill.